Please all rise. Hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the first case in the Doctrine and Covenants 3-25-2166, Midwest Generation, LLC, Petitioner Appellant, the Illinois Pollution Control Board, Illinois Environmental Protection Agency, Respondent Appellate. Arguing along the back of the appellant, Ms. Kristin L. Gale. Arguing on behalf of the appellee, Mr. Benjamin F. Jacobs. Hi, good morning all. And Ms. Gale, if you're ready, you may proceed. Good morning. May it please the Court, my name is Kristin Gale, and I'm here on behalf of Midwest Generation, LLC. This matter is regarding an area of land commonly called the grassy field, that is not, and never was, designed to hold an accumulation of liquid. Instead, it is an area that if there was any design at all, it had been designed to not contain liquid. The grassy field contains non-containerized CCR. Thus, it is a federally regulated CCR management unit, and will be addressed thusly that way. Do we know the soil mixture in this grassy field? It's coal combustion residuals. The actual soil type, is it all? Yes. OK. Yes. Yeah, it's on the west-hand side, it's probably about a foot. And on the east-hand side, it's about 15 to 20 feet. Because this is regarding interpreting the statutory definition of a CCR service impoundment, we submit the board's decision must be reviewed de novo, and the board is entitled to no deference. To be a CCR service impoundment, it must be designed to hold an accumulation of CCR and liquid. And the key here is design, which requires a tent, or a plan, or a specific function. And here, design, or tent, or a plan for a CCR service impoundment is sedimentation. It's designed for the CCR to fall out of solution to the base of the unit, while the water is held at the top within the unit. In fact, the very purpose of sedimentation is to control the water. It's to keep it within the unit, typically to reuse, and in this case, at the station to reuse. And so the water is decanted from the top, and it's reused in the station, pulls in more CCR, goes into the unit, and so forth and so on. It's a passive method to collect the CCR and then reuse the liquid. And how long has that field, the grassy field, been there? The grassy field was originally a naturally sand dune, and then when it started being used by the station, they took advantage of the natural sand dune to separate the CCR from the liquid. The liquid actually infiltrated, and that started in about the 20s. And as you see in our brief, there were three phases to the grass, to the entire slag field. Started out as a slag field, and then in that instance, the station used infiltration. Now, it's hard to say using the sand dunes is a design. They took advantage of the natural situation. But if there was any design that was put in there, it was the ditches that were on the surrounding area to promote drainage, and then ultimately, the ditches that were excavated to further promote drainage. And that occurred up until, and that's your question, 1970, when they cut off the grassy field to create the original ash pond. And so, if there is a piece of land anywhere, and it starts to accumulate this water and sediment, they can, if you're saying the way they made this determination, they can determine that any place is a CCR. Well, that's exactly the problem. If you just have any area that, for a brief period of time, accumulates CCR and liquid, but it's not designed to do, then the state can say anything says CCR, surface impoundment, which doesn't make any sense. And actually, you're reflecting upon an example that occurred to me this week. I don't know if you had rain a couple days ago, but we did in my town. And no one would argue that a road is designed to hold an accumulation of liquid, right? And yet, a couple days ago in my town, our roads had a lot of accumulations of liquid simply because the storm drains, and the storm sweaters couldn't keep up. And in some instances, that accumulation lasts for like 15 minutes to a half hour. And yet, that brief period of accumulation doesn't mean the road is now designed to hold an accumulation of liquid. But let me ask you this, how about the numbers that they determined, the dangerous or hazardous numbers that they determined with respect to this liquid? So you're talking about the groundwater contaminations, ma'am? Yes, well, certainly there is groundwater contamination in the area, but Midwest Generations expert who testified at the hearing found that there's no really little offsite risk. So the contamination is contained within the property. And simply because it's not a CCR service impoundment doesn't mean nothing's gonna happen. It is a federally regulated CCR management unit. And under that federal program, it will be investigated, they'll be required to look at the groundwater, to look at how much the CACR is there, and then they'll have to do a closure. And a closure is a term of art. So you have to either remove it, or you have to cap it with an engineered cap. And this takes time, and this is a process. So it's not nothing will be done. And the board's apparent position, as I read it, is they think the only way to treat this area with this contamination is as a CCR service impoundment. And I think that is not correct. It is a federally regulated management unit. In fact, US EPA created this regulation to address units just like the Grassy Field. It was a gap US EPA identified. And they used the Grassy Field in their preamble for the CCR management unit regulation as an example of a CCR management unit. So clearly US EPA doesn't think this is a CCR service impoundment. So what is your, and I know you said this, what is your suggestion to the state with respect to this area to allow it to be continued to be, to agree that it's a CCR management unit and it'd be regulated as a federal unit? Now the state, the state's CCR regulation is premised upon the federal regulation, right? The General Assembly simply copied the federal definition. And so speaking in a hypothetical, it's possible the state could copy also the CCRMU. But to try to shoehorn this area into a definition that it doesn't fit fundamentally just doesn't make any sense. Plus it cannot not be a CCR management unit. There's no path that way. It is considered a federally regulated CCR management unit. So right now Midwest Generation is faced with being both a federal CCR management unit and then a state CCR service impoundment. And those regulations in some respects are somewhat similar, but the very biggest difference is the timeframes. And that is where Midwest Generation's experts said it would be a logistical nightmare because we have to follow what the CCR management unit requires timeframes, but then also work with, if it's also a CCR service impoundment, work with the state timeframes. And the possibility that puts Midwest Generation at risk, the possibility of being in violation or one or the other. And the other thing is, is because these are two programs, even though they have similarities, something like today, by the very nature of being two regulatory programs, those similarities could diverge over time. Putting, again, putting Midwest Generation at risk of being in non-compliance in the future. And fundamentally, your honors, I would suggest, or I put forth, submit, that is just wrong for a unit, a single unit, to be in two different programs. It is a burden upon the owner and it makes things difficult and really it puts them at risk of, oops, we missed this regulation here because we're trying to follow this regulation here. And it just doesn't really make any sense. The board made a finding that it is inactive at this time. And so what if, I'm assuming that means just like an inactive mine or an inactive whatever, it's not being used anymore, correct? That's correct. That's why we call it a grassy field. And so what, this would be the only enforcement of any sort of penalty or fine sanction if it's inactive, correct? Well, this is not a enforcement action by the state. Rather, this is an adjusted standard that Midwest Generation brought, which you can under the act, within 21 days of a regulation, that stays the process of that regulation because you're demonstrating that this area is substantially and significantly different than what the board was considering when it passed the regulation. So there's not a penalty here, but to your point that the board deciding it was an inactive CCR surface impoundment, to be an inactive CCR surface impoundment, it first must be a CCR surface impoundment. You can't, that is the fundamental definition. An inactive CCR surface impoundment is a CCR surface impoundment that is no longer in use. And here our position is that grassy field was never a CCR surface impoundment in the first place, so it cannot be considered an inactive CCR surface impoundment. And so what is the adjusted standard that you're looking for? Well, the board has, and it's done it in other measures, they just find that the unit is not a CCR surface impoundment. So we have that, in fact, Midwest Generation, the board has found for it, other units that the Illinois EPA considered CCR surface impoundment that we went through the adjusted standard process and found that board agreed that it was not. So the finding would be, this is not a CCR surface impoundment and therefore is not subject to its Part 845. So, I mean, I'm thinking of this in terms of zoning laws. In zoning laws, we might call this a variation, but you don't even want a variation, you just want a declaration. That's correct, and that's, there are, under the Act, you have variances and you have adjusted standards, and you're thinking of a variance. And under the Environmental Protection Act, this is an adjusted standard, it's a, sorry for using the definition of term, but it is a adjusted standard to the regular standard. So it is a, it's forever. Unless, I guess, unless circumstances change, although I've never heard of that. I wanna, so I've been focusing on the term design, right? Again, the CCR surface impoundment was not designed to hold an accumulation of liquid. Instead, it started off, as I've said, as a natural sand dune, and the station took advantage of it. And then it, the station then excavated ditches within to get, to design to move the water as quickly as possible. And now I wanna turn to the importance of time for CCR surface impoundment. And that's where the terms hold and accumulation are key. Because both include a duration of time in their definitions. So as, you know, a definition of hold is to keep in a container, and another definition, the Collins definition, is if a hold holds something, to keep it available for future use, explicitly using a temporal element. And, you know, the examples you see, it's like a jug holds a gallon of water. So if a jug's holding a gallon of water, it's holding it for a period of time. There isn't a great, you know, allowing it to fall through. And so, yes, sorry. How long, how long do we need to hold the water? Again, it goes back to the design, right? So it has to be designed to hold water. So right, we hold a jug of water and you turn it over, you're not holding it for a very long time. But that jug of water is holding that liquid until a design function happens on it, if that makes sense. So it's about design. So the design, and I think what we're getting at is, to your question about is the boards, there's no set amount of time, it's really effectively stating that holding and accumulation may be instantaneous. Which, if you start thinking about it, that doesn't quite make any sense. And, because there has to be some time for it to hold in a sense of sedimentation, that time is part of the design. The purpose of sedimentation is to allow the material, and in this case, CCR, to fall out of solution. And some instances, the CCR is very fine. And so it takes time for it to settle out. Because you want, at the station, the impoundments, I don't know if you had a chance to look at the map, the impoundments actually are used. And so the water travels around the U as the CCR settles out. So that by the time it gets to the other end, the water is, I wouldn't call it clean, but it certainly is, it has most of the material, if not a significant amount of material, has moved out so it can then go capture more material. So time is part of the function of sedimentation. And comparison, for infiltration, time's not a factor. It's really just how it gets through as quickly as possible. So every time it rains, like it rained when your streets were full, that grassy field is really mushy. Actually, that's not true, because it's on a slope. It was engineered for the water to head to the west and to the south, to the ditches, so. Okay, it's just the ditch, or isn't there some sort of industrial use someplace around it? There are, well, it's surrounded by industry, you're correct, and directly to the west of the rest of the field across the ditch is an old, the Grass Slagger Tannery, which was a tannery that went through the Illinois Site Remediation Program, which is a program in Illinois, it's actually a great program, where a property can be cleaned up pursuant to state regulations, and under the Illinois Environmental Protection Agency's oversight, and in that case, they cleaned it up under Illinois EPA's oversight, and this is an important detail. It didn't remove all of the contamination. There is still contamination coming on to Midwest Generations property, because in Illinois, under that-  From the tannery, correct. It's primarily arsenic, but there's also boron, and I believe also chromium. But in Illinois, so it's not about removing all risk, it's not about removing all contamination, it's about managing the risk, and making sure no one's touching it, right? So no one's drinking it, no one's touching it, no one's eating it if it has soil contamination. You have a, and in this case, from Midwest Generations property, it's within the property, so our expert evaluated the contamination that's coming off the grassy field, so that by the time it gets to the other side of the station, it's well below the concentrations that would cause any harm to Lake Michigan. And in fact, I don't know if you saw- Go ahead and finish your thoughts. Thank you. Waukegan certifies that its water is clean, despite the runoff from the surface, because they collect their water, I think it's 6,000 feet off site. Tanneries tend to have another source of water nearby. Is there another pond on that property, or any way that this could get to another source of water, other than Lake Michigan? I did not know that tanneries have another source of water nearby. A tannery is near one. Oh, yeah, okay. They have to put it somewhere. Got it. No, there is no other pond nearby. That tannery went away probably in the 70s, so I'm not quite sure what water they used, and whether they discharged to the lake. That's something I'm not quite familiar with. But there is no other pond. And again, in Waukegan, the drinking water source is the lake. But at Midwest Generation, and because of the tannery, there are institutional controls, they're called environmental land use controls, that bar any sort of drinking the groundwater there, because of the historic contamination. Do I have no other questions for you? Justice Shostak? All right, you'll have an opportunity to reply if you choose to do so. Thank you so much. Thank you. All right, Mr. Jacobson, are you ready to proceed? Yes, Your Honor. Thank you, and may it please the court, Assistant Attorney General Ben Jacobson, on behalf of Petitioner's Illinois, Illinois Pollution Control Board, and the Illinois EPA. This court should affirm the board's reasonable interpretation of the definition of a CCR service impoundment in Section 3.143 of the Illinois Environmental Protection Act. It is an interpretation that recognizes the nuance in the terms design, hold, and accumulation, and implements the General Assembly's instructions to protect the environment and public health to the greatest extent possible. This stands in sharp contrast to Midwest's interpretation that cherry-picks definitions, adds language into the statute, and inappropriately relies on expert testimony to construe statutory language. So you submit, we should not use the plain meaning of the words? No, Your Honor, we should use the plain meaning. It's just that the plain meaning has more nuance than the meaning that Midwest Generation is trying to give it. So, here, while the terms hold and accumulation have a temporal element, as the board itself acknowledged, that temporal element doesn't have a minimal period of time. One of the questions was getting at this. And what the board recognized is that holding or accumulation can be for a short period. It can be temporary. And what we have here is, with this sandy ground, the liquid and CCR, as it hits that ground, is not going to instantaneously flow through. And this is something that at least Dellen and Leckrone discussed, I believe Dunway did as well, it's going to pool on that ground for a short period of time, and accumulate there and be held as some of it is being infiltrated down. So how can you conclude that the grassy field was part of the CCR service impoundment? So, Your Honor, from the 20s-ish until 1970, that the entire 40 acres was the site that it was sluice to. And this 10-acre portion is just the westernmost portion of that. So all of it was a CCR service impoundment for that 40- to 50-year period, because the intent of the facility at that time was to take advantage, as my colleague noted, take advantage of that natural topography. Right, right. The dunes have ridges and depressions. Dellen himself described the lower areas between the sand dune ridges as depressions, where the water, the liquid, and the CCR are going to be held and accumulate. And Dellen himself described how that was sufficient to keep the liquid and CCR from leaking onto adjacent properties or into Lake Michigan. It was, the intent was to hold it there so that it could settle, some of it could settle, some of it could filter through, and it would eventually leave just the CCR on top. So it was subsequently seeded, correct? That 10-acre portion, yes, after it became inactive. Right, so how long had it ceased being used or being inactive? I believe that it became inactive in 1970, and it was around 1978. My colleague maybe can clarify the exact date, but I believe it was in the late 70s that it was seeded. So it was for a period of maybe a decade-ish that it remained inactive before it was seeded. Okay. How do you determine, though, and I might be jumping ahead, but how do you determine whether it was dangerous then or dangerous now? So I think this is getting at kind of the, one of the Section 28.1 adjusted standard factors, whether the risks are substantially and significantly different from those that were originally contemplated by the board. It's what the board was originally contemplating when adopting these regulations. So it's what the board was contemplating when adopting the regulations governing CCR surface impoundments. So I don't think there's any disagreement that at the time that all of this liquid in CCR was sluiced onto the field, that it certainly was dangerous and it contained contaminants. And I don't think there's any disagreement that even now it still contains contaminants. It's about whether or not the levels of those contaminants are above what is safe levels. Correct, correct, yeah. So talk to me about those levels of contaminants. I mean, are they to a level where this, I mean, based upon what you're saying, any area can become a CCR. No, I don't think so. You don't? It would have to be an area that was designed to hold an accumulation of liquid in CCR. So the grassy, I want to keep saying the grassy, no, but the grassy area was originally meant for this and then it was subsequently ceded over, and it's not used for this anymore. So we're still calling it a CCR. It's an inactive CCR service empowerment. And the reason that we have these different designations for a certain kind of CCR site is that the risks that are attendant to each of these different kinds of containment sites for just to make it simpler, is that each of them has a different way that they present a risk. And so what we have here is, because this was originally designed to hold that liquid and the accumulation of liquid and CCR, we want to apply the monitoring scheme that is attendant to that original purpose. And to kind of jump to the side a little here, Your Honor, there is nothing in the record saying that this 10-acre site is a federally regulated CCR MU. In the preambles to the proposed and the final EPA rules in the record, it suggested this could possibly be one. But there's nothing in the record showing that this is a CCR MU. And that was a rule-making. That was a general rule-making process. Whereas what we have here is a quasi-judicial adjudication, looking at the specific facts and going through that intensive fact-finding. It's also worth noting that the CCR MU regulations are self-implementing. And in addition, any closure process that is mandated under that regime was recently pushed out to 2032 at the earliest by the U.S. EPA. And so the monitoring and oversight and the eventual closure that is mandated is simply not occurring here under the CCR MU regime. But regardless, any monitoring that's required under the CCR MU is already being done by a CCR SI. The service impoundment oversight is more extensive. It requires, under state law, it requires financial assurances. It requires more frequent monitoring. Under the state regime, one instance of a contaminant level being above the safe level is gonna require remediation, whereas under the federal regime, it's only the second instance that requires remediation. But all of these things that Midwest would be doing to comply with the service impoundment oversight, that would cover anything that's required under the CCR MU. So there is no nightmare of compliance. And Midwest has never explained what that nightmare would be. They've simply stated that it was. Dellon himself never explained if he just said it would be. They say there could be potential risk of noncompliance with one by complying with the other, but in fact, by complying with the service impoundment requirements, you're complying with the CCR MU requirements. On page 20 of her brief, she talks about sedimentation versus infiltration or sedimentation or infiltration. How is her argument incorrectly interpreted? Well, Your Honor, this goes to, like you said, the plain language. Sedimentation and infiltration are nowhere in the, in section 3.14. They're nowhere in the EPA rule. So the plain language is that it's a, you know, topographical depression, it's an excavation, or it's a man-made, or it's a dike that is designed to hold an accumulation of liquid. The federal EPA and then our legislature, the General Assembly, chose to use plain, ordinary terms to describe this technical word, this technical concept. And they could have chosen to include terms sedimentation and infiltration. They didn't. So by requiring sedimentation, that is inserting words into the statute. And having an expert opine on the plain language to include sedimentation is simply inappropriate. An expert witness, even an attorney, cannot testify to the meeting of a statutory term. The case that we relied on, the court did say that it was inappropriate for the witness there to testify because of the adverse witness rule. But also, in addition, it was inappropriate because a witness can't testify about the meeting of the statute. And if you go through and look at the cases, they did say that. Well, doesn't common sense or common nomenclature allow you to do that? In common sense, in terms of someone saying, you know, what hold means, or to, I mean, I don't, I think no. I mean, I think obviously the lawyers can argue about what that means. And the board here, or court, could talk about what those definitions mean. But no, I don't think a witness can testify about what a statutory term means. Especially inserting a technical definition that a CCR service impoundment can only be for sedimentation, for settling. And in fact, it's worth noting, as my colleague just described, when that first ash pond was built in 1970. So in 1970, the western, or the eastern two-thirds was burned. It was closed off. There was no liner. There was no what? There was no liner underneath. It was still just that sandy ground. And the CCR that had already accumulated there, they considered that a CCR surface impoundment. But it was the same kind of combination of sedimentation and infiltration. And in addition, with the current ash ponds and their design, the two ones, she described that they were kind of a U shape. So the water moves, and as water moves, some more of the CCR settles down. So just, you would have that on the sandy ground as well in this, you know, the original 40-acre field. Let me ask you a question. Say, they terminated using that as a CCR some time ago. How, what would somebody have to do in order to ensure that that is no longer going to be considered a CCR? So this is going a little bit beyond my knowledge. I believe that the- Well, she talked about capping it off. Capping and closure, yes, Your Honor. So capping and closure is the ultimate goal, whether it's a CCR surface impoundment or whether it's a CCRMU. And that, I believe, is what gets you to the end goal. You still have post-closure monitoring requirements, and those are more expensive under the state CCRSI rules. So at the end of the day, what we have here is Midwest is looking for the regulatory regime that requires them to expend less money and have less to do and less time, and it's going to be longer before they have to do anything because under the current state rules, they have to be doing stuff now, whereas as I noted under that federal EPA rule, they pushed that out, closure out to even starting until 2032, and everything currently is self-implemented. If there is no bottom liner and there is no liner around this whole, what is it, 40 acres originally, or this- Yes, Your Honor. All right, if there's no liner anywhere, and when they cut off this 10-acre parcel, no liner was injected or no dike was injected, what can the design be that you're looking at? So the design that we're looking at is still that original design. So once it was cut off, it was no longer an active surface impoundment. Okay, but what, I don't know, what designs a field? Well, sorry, Your Honor, so in design, you can take advantage of natural topography. That's in the definition itself in 3.143. One of the structures that the legislature described as being designed to hold an accumulation of liquid is the naturally occurring topographical depression. Okay, so what you have is taking advantage of what is naturally occurring there. What was naturally there were sand dunes, and so the sand dunes had natural ridges, natural depressions, and we're taking advantage of that natural ridge, which is one of the definitions of a dike. You have a natural ridge that is going to keep and hold that liquid in CCR in that natural depression between the ridges and allow, you know, it will hold that liquid and some of that liquid will accumulate just like with a coffee filter. You know, when you put a coffee filter in a coffee maker, especially to pour over, you have the grounds in that on top of the filter, and when you pour that water in on top of the grounds, the water is going to fill up. You can't just keep pouring water in there. So some of that water is accumulating and it's designed to hold that water temporarily because for the coffee maker, you want the coffee, you want the water to absorb some of the flavor and the caffeine, et cetera. And with the field here, you want some of that water, you want that water to accumulate and stay so that some of the CCR can settle, can do sedimentation, which is what was described by Leckrone in his testimony that on this field, there would be accumulation of water and some of that CCR would settle out as the water was held there and as the water was moving. And exactly as my colleague described in the current versions of the ash ponds, they're U-shaped and as the water moves through that U-shape, some more of that lighter CCR is going to filter out over time. And you have that same effect in the sandy ground in the original version of this field that included the 10-acre site here. I did, but the word design, even as you've used it, the coffee filter, that is a conscious product that you create to do exactly what you said it does. How can a field of this nature, well, let's look back at the authority. Who designed this? The Lord? The nature? Mother Nature, she was evil and designed this in this way? I mean, when I look at the word design in this concept, I think of somebody created it and did this to do exactly what it's doing. It's just not a natural flow. It's like natural accumulation of ice and snow, which is something I will never understand, especially when I fall on it. So who's designing this? So design has more nuance than just the we made it, meaning, and if we look at some of the additional definitions that we provided in our brief, the design takes advantage of what's already there. Obviously, the sand dunes sitting there in the 18th century, no one's designing them. But once you come there and you go to that field, you build the facility next to it, and you go and use that field, you sluice the CCR liquid to that field, the design is taking advantage of what's already there for your purpose, which is to hold and accumulate that liquid and CCR. I mean, with... Excuse me, that sounds more like it's used for that purpose, it's not designed for that purpose. Well, then that would read the words, a naturally occurring topographical depression out of section 3.143. So we're just working with the language that the legislature here chose to adopt. If you can't design a naturally occurring topographic depression, then that gets completely pulled out of the statute. Just because the legislature here chose to use the exact same language as the federal rule, that doesn't mean that our General Assembly had no intent. We still have to look at the language itself, we still have to look in engaging the regular plain language statutory interpretation rules, we still need to look at the statutory terms around it, keep it in context, and it's worth noting that there are instances where our legislature chooses to incorporate explicitly federal language, federal statutes, federal regulations, but where they do that, they say we adopt the definition as contained in 10 CFR 25, whatever, as now or forevermore defined. And that's not what they did here. So the fourth district actually rejected a similar argument raised by Midwest Generation in that 2044 decision, which has the name conveniently Midwest Generation. That's cited in both briefs. In paragraph 56 to 66, in a slightly different context, the fourth district said that we have to look at what the legislature chose to say here, and not just what the federal rule says. All right, Justice Shostak, anything else? Well, sir, if you would sum up your position, and because we've taken you over your time. Thank you, Your Honor. I'm happy to keep answering your questions as long as you'd like. But in sum, the board engaged in plain language statutory interpretation. It recognized that the definitions of these terms have more nuance than the cherry-picked definitions that Midwest Generation wants to pull out here. And even on DeNova review, as this court explained recently in the Commerce Commission beneficial electrification case, even on DeNova review with a complex statutory scheme where we're dealing with technical issues and the board is comprised of technically qualified members, that interpretation by the board is still due substantial weight. And this court should affirm the board's definition of CCR surface impoundment and the factual findings that were supported by evidence in the record. Thank you. Thank you. Ms. Gail, if you wish to respond, you may do so. Thank you, Your Honor. Just a few things. Specifically, I want to correct one, I think perhaps inadvertent misstatement by my colleague. Mr. DeLean did not say that the original slag field was sufficient to keep the CCR and liquid. What he said and what was actually written in my colleague's brief, which was correct, that it was sufficient to keep the material, the CCR on the original slag field. But the whole point of the visual slag field was to move the liquid as quickly as possible. And that was Mr. DeLean's testimony. And I want to get back to this discussion about design. And you are correct, the sand dunes were designed by God or Gaia, whoever we like to choose. But ultimately the design the station implemented was a design through the ditches it excavated throughout the field. And that's the design. And that design promoted drainage, the opposite of accumulation and the opposite of holding. And so I think the board's kind of misinterpreting what a design would mean. Design, as Mr. DeLean testified, is form follows function. So when you design something, you want that form to do what your function, what you're supposed to do. And so for CCR surface empowerment, the form it's designed is the function of holding an accumulation to get that function of sedimentation. And so that's, I think that's the part that's missing here. So even inadvertent or somewhat collection or accumulation of liquid doesn't mean the function is an accumulation of liquid. And my colleague used coffee as an example, coffee grounds example. Well, a coffee is designed actually to, the function is to get the treated water underneath, right? It's designed for the water to go below. Whereas for CCR surface empowerment, the very design of a CCR surface empowerment is to keep the water within. As UCPA said, it's to impound CCR and water for an extended period of time. That was in its regulation and its preamble when it passed the original rule, I believe in 2015. I also want to say about address the whole timeframe. And he's, you know, he talked about the conflict that this generation addressed. And, you know, and he said the closure is supposed to initiate by 2032. And I can appreciate that sounds like a long time away from now. However, in the EPA, when it passed the regulation in 2021, it received in October, 2021, operating permit applications for 45 units. And then in 2022 or thereabouts, we received construction permit applications for 30 units. Since that time, Illinois EPA has issued one operating permit for four units and one construction permit for one unit. They're slow moving. And so even that six years sounds like a long time to us. If they haven't issued permits for this time, we're looking at, and also closing doesn't just happen. You can't just do it in an instant. You have to get engineering drawings. You have to, and engineers have to figure things out. And that takes time. Oftentimes it's about a year. So these plannings have to happen earlier. So, and you have to plan for these things. You have to plan your, this is still an operating station. Now it does no longer burns coal, but it has peaker units. And so it still is working. So there's a lot of planning that goes into it. And that, again, for a station like this, for a lot of these stations, time is long. And so the conflict here, the potential conflict here is still very real. Also, as I said, even though the closure of closure in place and closure by removal are similar now, and even though some of the, and I would disagree with my colleagues' contention that the CCR management unit is somehow less strict than the state requirements. They're equally as strict and they're equally as protective of human health and the environment. So the idea that Midwest Generation is somehow trying to get out of something is really misplaced. The company, the planners, Helen's company, was terminated using this as a CCR in the 70s? What, the Grassy Field? Yes. The prior owner ceased using the Grassy Field for managing CCR in 1970 when it built the original ash pond. I'm sorry. And have you had, as Midwest Generation, heard anything about this grassy field up until now? From the Illinois EPA? No. So, no. I would tell you that there is a enforcement action by environmental groups called Sierra Club et al versus Midwest Generation that is still pending before the Illinois Fish Control Board alleging groundwater contamination in part at the Waukee Station, at many of its other stations, in part coming from the Grassy Field. The same expert, Mr. Dorgan, that testified in that matter testified in this matter and came to the same conclusion that the risks from the area are not substantial and not all risks are offsite sources. So. Thank you. Thank you. If you can summarize your position or maybe take one more point you want to make and then summarize, please. Oh, the point he was making about the Midwest Generation versus IPCB, and he referenced some paragraphs that Midwest Generation, I think he was talking about the appeal of the regulation. In that instance, I don't have that case memorized, but I'm pretty sure when you were talking about interpreting of definition, again, it was the interpreting of definition of the inactive CCR surface impoundment. And in that case, the court said to be an inactive CCR surface impoundment, you first have to be a CCR surface impoundment. So the reason stated in, I would ask that you reverse the board's opinion and find that the Grassy Field is not a CCR surface impoundment. Thank you for your time. Thank you. Thank you. Thank you very much. All right, counsel, thank you for your arguments this morning and operating under some adversity. We will take this matter under advisement and issue a decision. In due course, we will recess now to prepare for our next case. All rise.